Good morning, Your Honor. May it please the Court, Daniel Winnick for the Department of Labor. The District Court enjoined the Department from relying on PEPRA as a basis to deny the certification of grants to California transit agencies under Section 13C. That ruling was incorrect on its procedural and its substantive grounds, and we don't think the Court can affirm it without reaching the substantive grounds. But before turning to the substance, I want to start with the questions the Court raised in its order on Friday. So as an initial matter, the premise of the Court's first question is that final agency action is a matter of subject matter jurisdiction. We don't actually think that's correct, and there's a split among this Court's cases on that question. So I'm aware that there are cases where the Court has said it is jurisdictional. There's also cases where the Court has said it isn't. I'll cite just one, Friends of Yosemite Valley v. Norton, 348 F. 3rd, 789, and that cites another case. There's also a split among the Courts of Appeals on this. The D.C. Circuit notably has said since a case called Trudeau v. FTC in 2006 that it's not jurisdictional. And we think the sounder view is that it's not jurisdictional because the Supreme Court made clear in Califano v. Sanders that subject matter jurisdiction to review agency action stems from the general federal question statute, Section 1331, not from the APA. If finality is not a matter of jurisdiction and the Court doesn't need to decide it because the parties stipulated in district court that this was final agency action, the stipulation is at 4ER568, if it is jurisdictional, we think the sounder view under circuit precedent is that this action was final. Nonbinding statements of policy often will not be final because they will leave unclear how the principles articulated in the statement may apply to a particular. Sotomayor. So if there is final agency action that expresses a policy, if there's a change, as I understand the Supreme Court's law on this, it has to be explained. So this policy, if it's just a letter, they could change their mind tomorrow without an explanation, correct? Correct. And that's why we think it's a nonbinding statement of policy. Well, if it's a nonbinding statement of policy, why should courts entertain, I mean, precedent obviously will potentially dictate the outcome, but I'm looking for an explanation about why a court should entertain a lawsuit that says I got a letter and I don't like what's in the letter. I mean, agencies send out thousands of letters. So it just seems to me an oddity to say that a letter can be the — without finality to it can be the basis of an action. The thing about this letter, Your Honor, that we think sets it apart from many other statements of policy that wouldn't be final agency action and as to which litigation wouldn't be right, is that this letter was definitive in saying how under the department's view it would treat future Section 13CL. Unless it changed its mind. Unless it changed its mind, which is universally true of final agency action — or universally true, rather, of agency action. And this Court and the Supreme Court have explained that the fact that an agency can change its mind doesn't on its own mean an agency action isn't final. What's distinct about this letter, I think, and the reason we, the government, think it finally even when in plenty of cases we take the opposite view, is that this letter is definitive in saying how the Department of Labor regards PEPRA. So barring some unanticipated change of heart from the Secretary, the letter makes pretty clear that the department would deny future applications, at least those that don't raise particularized reliance concerns. Well, even assuming all that were true, I still have a problem with ripeness under the SS, where at issue were actual rules that had gone through the rulemaking process. I think these were finalized rules that were being challenged, and the Court said those claims weren't right because the agency had not yet applied them to applicants, right? So even though the application on the rule would most likely result in a determination that the applicant wasn't eligible for relief, the Court said because it's an administrative action, they're seeking injunctive relief, it's a benefit, the rule itself, just the existence of the rule doesn't cause any detriment, and so the claim wouldn't be ripe until the application was actually filed and denied on the basis of the challenged rule. So why wouldn't this claim not be ripe until an agency or transit agency actually applied for the certification and was denied the certification on the ground of the letter being challenged here? The answer, I think, is, again, that the letter is definitive about how the department regards PEPRA. What was, I think, distinct about the policy in CSS is that it left considerable discretion, case-by-case discretion, for the agency to decide whether in a particular case it was going to do one thing or the other. I think CSS presents a useful contrast with the recent DACA litigation, right? So the DACA memo and the rescission of DACA, those were policies sort of like the one in CSS, enforcement priorities, but they were definitive about what the criteria were, and this Court, you know, treated them as reviewable. This Court said that the DACA memo and the DACA rescission memo were nonbinding statements of policy but did not question their reviewability. The Court has, in other cases, also treated nonbinding statements of policy as reviewable. Gill v. DOJ, for example, that's 913 F3rd 1179. And I think on – I realize the question was about ripeness, but on finality, which raises, I think, overlapping issues, another relevant case is Havasupai Tribe v. Provencio 906 F3rd 1155. So in that case, there was a Forest Service opinion letter about mining rights in a particular piece of public land, and everybody agreed that that didn't actually resolve the property rights. The property rights stemmed from property law, but the Court looked to the practical implications of the letter and the fact that everybody agreed that the mine wouldn't reopen until the Forest Service issued it. So, again, I realize that in many cases, the government would take a different view. In many cases, nonbinding statements of policy are not final and challenges to them are not ripe. What we think is different about this one is that it's definitive about how the Department views PEPRA, and there's no reason – Well, I thought the letter itself, though – I mean, it might be definitive about how the Department views PEPRA, but it wasn't definitive about how it would decide specific applications, right? I mean, it said basically the Department needs to get an application and then consider all the factors and make a decision about whether to grant the certification or not. So I think the one respect in which that's true as to PEPRA itself is that it leaves open room for reliance concerns to be raised in individualized cases. Now, we don't think that's a reason it isn't ripe. We think that the Court can and should resolve California's challenge to the interpretation of Section 13C set forth in the letter and to the Department's overall views about how PEPRA precludes the continuation of collective bargaining and that it can raise for future – leave for future cases a resolution whether a transit agency's particular reliance concerns compel the grant of a Section 13C application, notwithstanding these views. We don't think that precludes the entire challenge from being ripe. We agree, and we've said in our briefs, that we don't think the Court should reject this particular interpretation on the ground that hypothetically a reliance concern could I'm wary of my time, and so I might turn just briefly to the other issues, if I may. First, on the substance, assuming the Court concludes that there is jurisdiction here, we do think it has to get to the substance. It can't affirm the injunction solely on procedural grounds because the procedural grounds would be a basis only for a much narrower form of relief. I have a question for you about the merits. Yes. Many labor law statutes enacted by states have mandatory terms of employment in them, parental leave, meal breaks, whatever, and in a sense, those enactments disallow collective bargaining to undermine what's in the statute. Why is this any different? So those are exactly the sorts of statutes that states do have background policy or background rights to enact. And what distinguishes them from this, the two factors the Department noted in the letter. First, they set minimum standards instead of caps, and second, generally speaking, they apply to the labor force as a whole, not to public employment in particular. Here, by contrast, California set a cap on rights, not a floor, and it enacted a law specific to public employment. And so this was really an example of California. Those are descriptively true, but I don't understand in theory why that's any different from any other statute from a State that says, here are the required terms, and you can bargain around these as much as you want, but these are the terms that are required. And I don't understand why, in theory, that is a different effect on bargaining. So as a matter of first principles, what the State is doing when it enacts statutes like that is, in the exercise of its police power, it's saying, here are things we need for workers in this State to be protected. And the Supreme Court has held in a series of cases that California has not. So if the public is being protected instead of the workers, which I think is probably what the legislature has in mind, that that principle can't apply? It's inconsistent with Federal labor policy to allow a State to undercut collective bargaining rights by passing laws like this in itself. That's tautological, though. I mean, you're assuming that it undercuts collective bargaining differently than the other kinds of statutes. Well, I don't mean to be tautological. The reason we think it's different from the other kinds of statutes is that it's a cap. Those are the things that we believe makes it inconsistent with Federal labor policy. So let's ‑‑ I'd like to pursue this, and I know I'm going over your time, and we won't take it out of the other council, I hope. Let's say that a State passes a law that's more protective of public employees, saying, because these are public servants and they are not working for as much money, we're going to give them longer rest breaks and longer meal breaks. And, you know, maybe even a better minimum wage. Is that forbidden also? I don't have the Department's view on that. Certainly nothing in this letter suggests that that's forbidden. And, again, I think the difference is it is a matter of the State exercising its police power in the interest of workers, and it's ‑‑ it's, I think, pretty easy to see why that might be different as a matter of Federal labor policy from a statute that restricts workers' rights in the service of the State's own interests. In my hypothetical, I was cutting out only the question about whether it matters that a statute is specific to certain kinds of workers. What if there's a statute about agricultural workers and another one about public employees? I don't understand why that makes a difference. I understand the hypothetical to be differentiating between the part of the workforce it affects and whether it's a cap or a floor. My point is nothing in this letter suggests that something that was ‑‑ that set a floor instead of a cap would be inconsistent with Federal labor policy. Again, I don't have the Department's view on that. The Department would have to decide in an appropriate situation whether that precluded Section 13C certification. But I think it's different from this sort of statute and different from anything the Department's talking about in the letter because it does set a floor, and it's, therefore, not this sort of situation where the State is legislating in its own financial interests and against the interests of workers. And the Department concluded that that was inconsistent with Federal labor policy. Just briefly on the procedural issues, I'm happy to take any questions the Court may have about them. Again, we don't think that the injunction could be affirmed solely on that ground because it would be the basis only for a narrower remedy. And so if the Court concludes that there is jurisdiction here, we do think it needs to decide the substantive question. And we would suggest that if it reverses on the substance, it could then decide the procedural issues to determine whether some narrower form of relief could be appropriate on remand. And with that, unless the Court has further questions, I will... No, but I'll give you one minute time for a rebuttal. Thank you, Your Honor. May it please the Court, I'm Andy Roth on behalf of the ATU parties. Your Honors, I want to start out. I think a lot of confusion has been created here in terms of finality and statutory authority. This is not, this document that was issued in 2021 by the Department of Labor is not a policy statement. There's not a word in here that says we have been granted policymaking discretion to see if it's a good idea whether states have to maintain collective bargaining rights in order to get their transit agencies to become eligible for grants. This is on its face. It uses the word interpretation. It is, it returns to what it characterized as a longstanding interpretation. This is not a policy statement. It's an interpretive rule. It's saying, and it's saying in greater definitive, with greater definitiveness than counsel for DOL is willing to acknowledge, that this precludes us as a matter of statutory interpretation, not as a matter of policy. It effectively, this is, I'm quoting from page two of the determination, effectively precludes us from granting, from certifying grants. And it says, we will therefore, it is about as definitive as an interpretive rule could be, we therefore will follow that preclusion approach and we will, there were grants pending at the time in terms of ripeness that was coming up one month. It would be elevating form over substance to send it back. The only reason the grants weren't denied was because the district court enjoined the DOL from following through on its determination that it was required. This is not the only part in the determination where they say precluded. If you look at page seven, it's even clearer there. We cannot, on page seven at the end of the second full paragraph, we cannot make the conclusion that Congress asked, demanded as a prerequisite to certifying grants, and they said it is a matter of interpretation. I'll quote. Because there is this diminution of collective bargaining rights, in the Department's assessment, this constitutes a significant interference with transit workers' collective bargaining rights such that they are not, quote, continued within the meaning of Section 13C, and the Department cannot certify those grants. Now, the Department puts, tries to put a gloss on this, not the Department, excuse me, DOL counsel, tries to put a gloss on this by saying, well, we left open the small possibility, left a little room that a State might have a, a transit agency might have a reliance interest on getting the grant, and so it's not as definitive as, it's not 100% definitive. But that actually is not true either. Right in the sentence before, it says we will deny these grants. It says, well, we're not going to, we didn't make provision for deobligating grants that were previously given based on the prior determination, interpretation that they're overruling. It says the Department's conclusion that it's not going to go back to, to try to get clawback money accounts for any reliance interest that the State of California and a transit agency may have based on the prior 2019 determination. So it fully accounts for any reliance interest. And as a matter of law, there is no reliance interest. I think the Court has to understand the, the structure of this statute. This statute says, and as it's been interpreted both by the D.C. Circuit and A.T.U. v. Donovan, and the Supreme Court, although it was dicta, I'm citing footnote 10 in the Jackson Transit Authority case. It says this statute demands that the Secretary of Labor ensure that State law preserves collective bargaining rights before Federal aid can be dispersed. The D.C. Circuit said it, and four times in text, and once in footnote 9, that the DOL has no discretion. This is not a policy. This is, this is what Congress, what Congress determined is required in these circumstances. And in that context, why did Congress say that? Congress, the statute, this is a, this is a labor protective statute. This says as a condition of financial insistence, the interest of employees affected by this assistance shall be protected by these arrangements. And these arrangements, in order to protect it, shall include provisions that are necessary for, for the continuation of collective bargaining rights, among other things. Now, the structure of the statute as such is, by forcing the Department of Labor to say, it's not a general grant of equity or policy, so the Department can't say, well, they haven't preserved collective bargaining rights, but poor, poor, poor transit authorities, they're, they're going to lose out on money that they were expecting and they need for projects. They, they don't have the power to do that. They have to, they have to deny certification. And the, the reason that Congress said that is because that creates an incentive. That creates, it's a, it's a, this is not a regulatory program, it's a spending clause program. And if the DOL says, if you don't preserve, if they have a, a, a hundred percent condition, you must preserve these collective bargaining rights, and they don't and the State prevents the transit agencies from doing that by enacting a statute like PEPRA says you don't have the authority to bargain over this. These pensions can't go that high anymore. So you're precluded from bargaining. So the, the, the transit agencies, they can't, they can't do anything. They're, they're sort of, their hands are tied. There is no reliance interest. They're not the acting parties. The acting parties here is the State, the acting party here is the State of California. And what this, what this statute does is say, all right, California. And what this DOL determination does is it does its job. This is what Congress said the DOL has to do to force this, these protective rights to be granted. So now the ball turns to California's court, and California needs to do what it did the first time around. There's no reason for a reliance interest to be recognized. There's no authority for reliance interest to be recognized. The harm to these transit agencies can be fully accounted for and must be under the structure of the statute by the State of California removing the, the, the prohibition on its transit agencies from bargaining over this. And that's what happened the first time around when the DOL issued a determination like this. California rushed in. They passed emergency legislation. And the emergency legislation, it, it basically set up a test case. That's why we're here 10 years later. It set up a test case that said, all right, you're temporarily precluded from transit agencies. You're, you're, you're temporarily exempted from PEPRA. You can bargain over this. If the district court rules that, that this exemption from PEPRA doesn't disqualify us from grant this application of PEPRA to transit agencies doesn't doesn't disqualify us from grants, then the, the, the exemption will go away. And the district court did hold that, and that's why it went away. But interestingly, it said, if the district court disagrees and upholds on the merits the DOL's position that PEPRA precludes certification, the exemption will be permanent. That's why this case is final. I mean, finality, it's, it's, there are two requirements. It's got to be definitive, and it's got to have legal consequences. This was, absent the injunction, this was going to have a legal consequence, very direct legal consequence. These grants were going to be denied. And that was going to create, if it hadn't been enjoined, exactly what Congress intended here, that it puts the onus on the State of California to remove this diminution of collective bargain agreements, to vindicate these rights, which have to be granted as a condition of, have to be protected as a condition for this. That's what the D.C. Circuit held in A.T.U. v. Donovan. That's what the DOL is saying in this determination. And in terms of ripeness, I mean, if anything, this case is over-ripe. This case, these rights have been protected. These rights have been denied, that this statute protects as a condition for the grants  All the existing certifications remain good. There's no pending certification that's involved in this litigation. No. This is reversing a policy under which the DOL — Right. Right. But when you're saying it's over-ripe, I don't understand that, because — It's over-ripe because the ripeness under the Whitman case that we cite at page 26, there are basically two conditions for ripeness. One is fitness for judicial review. This issue has been out there 10 years, okay? It hasn't been definitive. This is the only court that can definitively resolve this issue. It's a straightforward — what the Court said, the Supreme Court said in Whitman, this is a straightforward issue of statutory interpretation, so it's fit for judicial review. And I say it's over-ripe because it hasn't been decided by the only court within — that has jurisdiction over the State of California that can definitively decide it. It's been decided by the district court, but wrongly, we believe. And then — Well, suppose there's never another certification request. We'd be giving an advisory opinion. These certification requests come in 10 to 15 times a year. The State of California has 20, 25 agencies — None of that is in front of us on this record. But, Your Honor, there's no — there's no — it's a straightforward issue of statutory interpretation because there's no factual issue. Right, but we don't normally just issue opinions interpreting statutes without an actual case or controversy. There is a case or controversy. This — there are legal consequences that are going to flow from — from — if — would have flown — have followed if the district court had not enjoined it. These — the district court said we're about to reject these grants. And there's no fact — it's fit for interpretation from a statutory interpretation standpoint because the issue of statutory interpretation is whether PEPRA precludes its transit agencies from maintaining collective bargaining rights. The answer is yes. And it doesn't turn — it's not unique to any specific transit agency. Every — every application that came in would be defective under PEPRA because PEPRA says you can no longer bargain. You have to — you have to pay 50 percent — the employees who are protected here have to pay 50 percent of a pension. So it cuts back right there on that one requirement of the ability to bargain over not paying anything for your pension, which is traditionally what had happened in California. So there's no factual variation. The Court has all the facts it needs from the operation of the statute. That's the way the statute operates. It doesn't operate differently as to any transit authority. And that's why under the prior determination, when — when the Trump Department of Labor said, well, the statute isn't read that way, you don't have to protect collective bargaining rights in this fashion, the — every application that came in was routinely denied based on that interpretation. There wasn't any factual. It just — it just — it's a legal — it's a legal issue. It's a straightforward legal issue. And the Court has everything in front of it. It's been fully briefed up and down. We've written a 40-page brief that shows that this is the correct interpretation of the statute, and it doesn't vary by transit agency. Every transit agency has been precluded from bargaining in any meaningful way over pensions for the past decade. And this is — this case is ripe. It's overripe because the district court has issued, now, a set of this — over 10 years, these rights have been — I mean, in terms of hardship, which is the second prong of the — of the — of the ripeness test, the hardship is these rights have been denied for 10 years. And the Department of Labor said we don't — we're going back to our original interpretation. It's a straightforward issue for the Court. Is this interpretation a correct interpretation? Does the — does this Court agree with A.T.U. v. Donovan? This case is on all fours with A.T.U. v. Donovan. And, in fact, on page 7, when the Department of Labor says that — of their determination, when the Department of Labor says that we cannot do this, that's straight out of A.T.U. v. Donovan. That's exactly what A.T.U. v. Donovan said. As a matter of law, the State of Georgia has passed a statute which cuts back on collective bargaining rights. Therefore, the Department of Labor is prohibited. They may not. Look at footnote 9, the proceeding part of footnote 9. The Department of Labor has no discretion. This is a straightforward — the Court said this is a straightforward issue of statutory interpretation. Doesn't turn on any facts with regard to any — there, there was only one transit agency, MARTA. California happens to have 15 transit agencies or 20, I don't know how many, that are covered by PEPRA that get billions of dollars of aid. They're not — they have not preserved collective bargaining rights by virtue of that. They all haven't done that. Now, no California agency can come in and say, well, you should treat our application differently because we are maintaining collective bargaining rights. PEPRA precludes them from maintaining collective bargaining rights. No factual issue whatsoever, Your Honors. I see I've already — I probably won't get any rebuttal time at this point, but — and I haven't reserved any. But if the Court would allow me some, I would greatly appreciate it. Thank you. Good morning, and may it please the Court. Anna Ferrari for the State of California. Public pensions, like other forms of trusts, are regulated by states, as they have been since before the UMTA's enactment, in accordance with states' authority and duty to ensure that their pension systems are stable, solvent, and not prone to abuse. California enacted PEPRA under this authority for these specific purposes, and the Supreme Court recognized in its Malone decision that this authority does not conflict with federal labor policy, and it does not interfere with the process of collective bargaining. In determining that PEPRA's reforms prevent the continuation of collective bargainings, the 2021 determination is construing Section 13c2 in ways that Congress never intended. Section 13c2 was intended to create a provisional protection to ensure that the rights of unionized workers at failing private transit operators were not destroyed, to use the Supreme Court's language from Jackson Transit, after local public agencies assumed controls. Now, California transit employees already enjoy robust collective bargaining rights under state law, and Section 13c2 provides an additional protection to the process of collective bargaining, but critically, it does not guarantee any particular substantive outcome, and we learn that from the D.C. Circuit's decision in Donovan. PEPRA establishes modest parameters that prevent the outcomes of bargaining from reaching extremes that would impinge upon the state's responsibility to ensure the benefits promised, equal benefits paid. I'd like to... Counsel, do we have to agree with your view that it's a good policy for you to prevail? You do not, Your Honor. PEPRA's policy and purpose is relevant to analyzing whether it conflicts with federal relevant issues in this case, but the Department has positioned this question for determination based on interpretation of the statute alone, and the Court can find that PEPRA does not interfere with collective bargaining rights without endorsing the policies underlying PEPRA. I'd like to address the timing doctrines in the Court's order of last week. California agrees with the Department of Labor that finality is not a jurisdictional issue here because jurisdiction is conferred by statute, and so that is not necessary to reach. And I just remind the Court that both parties, both appellants have conceded finality before the lower court at ER 568 and also in ECF 106 at page 2. The test for finality, as Counsel has already reiterated, has been recently set forth in the Supreme Court's decision in Sackett v. EPA. It requires a consummation of an agency process and legal consequences. So here, the 2021 determination is an undisputedly final action. It purports to nullify other final grant certification decisions. And in it, the Department commits fully to its interpretation of Section C, 13C, on a prospective basis. It uses mandatory language that contemplates no exceptions. It says, on a prospective basis, it is not appropriate to deny grants so long as PEPRA is in the backdrop. And it is similar to the Department's prior determinations on this issue in terms of the content and the level of formality. Now, the Department alludes in its briefing to a possibility that it might conceivably change its mind down the road, but the Sackett opinion makes clear that that future possibility does not disturb finality. It's too speculative. As far as the legal consequences that flow from the 2021 determination, they are immediate, they are concrete, and they are severe. The 2021 determination was different from prior determinations in that it was directed to the regional administrator for the FTA. It was, in effect, it was not a communication to the public. It was not a communication to California transit agencies, letting them know how rights would be interpreted in the future. It was a directive to the FTA regional administrator to cease processing grants that otherwise would have been approved under the regime that had been in place since the 2019 determination. And the fact of this immediate effect is, to follow up on Judge Graber's earlier question, it is in the record. It's set forth in the Auerbach Declaration, which is at ER 204. This is the declaration that was submitted at the direction of the district court after California moved to stay implementation of the 2021 determination. The court wanted to know what is the effect of this determination and what grants are ripe for decision in the two months following its issuance. The Department of Labor identified 16 grant applications that were pending at the time, totaling more than $2 billion in funding that would have been denied had California not obtained a stay under Section 705. So, I agree with the department and with ATU that this matter is ripe for review in that regard. The harms, I will not belabor the point because it's in our briefing, but the harms that would afloat immediately to the transit agency include denial of assistance that would fund capital projects that are long-term, expensive plans that transit agencies embark on with an understanding that they will be completed from a financial perspective. It also includes operational assistance to transit agencies that they have come increasingly in California to rely on to offset diminishing receipts on account of diminished ridership due to the pandemic. Just as a few examples, in 2020, the losses to ridership were so severe that the Golden Gate Bridge and Highway Transit District served warn notices to its employee anticipating that it would not have sufficient funding to pay 20% of its workforce. And those layoffs were only averted because of emergency federal COVID relief that is subject to Section 13C certification requirement that issued in 2020 and that would have been denied to this agency were it not for the stay that California obtained. In addition to the harms to the transit agencies, there were also immediate legal consequences for the parties to the litigation. California and the Department were, up until that point, defending the 2019 determination as co-parties. And when the Department of Labor withdrew its pending motion for summary judgment to issue the 2021 determination taking the opposite position with respect to PEPRA, it became an adverse party to California. So that is an additional legal consequence that flowed from the issuance of the 2021 determination. As far as ripeness, the test, again, is fitness for judicial review and hardship to a party if judicial review is denied. The Reno case cited in the court's order frames this as concreteness rather than hardship, but it's effectively the same analysis. So we're now on the fourth iteration of DOL's attempt to tee up a determination on this issue for judicial review. And unlike the Reno decision where there were factual issues about the status and eligibility of undocumented residents who were in the plaintiff's class as to whether they were eligible for removal, here there's nothing to clarify on remand. The Department has presented this as a question of statutory interpretation, so there is nothing that would be clarified from that standpoint through remand. The Sackett case that I mentioned earlier is instructive on this point. The plaintiffs in that case had dumped, they had placed fill on their property in a wetland and they received a notice that their actions violated the Clean Water Act. And the Supreme Court recognized that technically the most final determination on whether they had violated the complete, the Clean Water Act would be triggered by the denial of their permit application for a permit approving the fill that they had already engaged in. But the Supreme Court found that it wasn't necessary to wait for the court to take the additional, I'm sorry, to wait for the agency to take the additional step to find finality because the compliance order operated as an effective denial. And so to hear the 2021 determination is an effective denial. And nothing will be changed by waiting for individual grants to be denied. Nothing in the 2021 determination contemplates that DOL would do anything differently based on the individual circumstances of the case. And importantly, in order, if the court were to remand the case for that purpose, for further grants to be denied, the effect on California transit agencies would be immediate and catastrophic. It would place them in the position of needing to apply to district courts and then this court for relief. Every time there was a denial, it would be inefficient. It would be difficult. It would be decentralized. And here all parties agree that this issue is ripe for review. If the court has no questions on ripeness, and sorry for going on for so long, I'd like to turn to the substantive issues in the case. Section 13C, it uses the ambiguous language when it refers to protections for the continuation of collective bargaining rights. But we can glean from the circuit courts that have interpreted the statute that that court decided in the Brock case in the D.C. circuit, and that it protects the process of collective bargaining, not the outcomes. If Congress intended for it to perpetuate individual substantive employment terms, it surely would have said that. And instead, constantly ---- Sotomayor, there's kind of an in-between ground, because at the time of the enactment of the Federal law, presumably it would have required the continuation, in effect, of existing collective bargaining agreements at that time, which would have had a substantive effect. That's a long time ago, and it doesn't affect these collective bargaining agreements specifically, but that's how I would read that piece of the statute. The rest of it is procedural, as you say. Well, I disagree. I think that Section, you know, there's a number of individual rights protected by Section 13c. And Section 13c-1 is directed at the substantive rights. Section 13c-2 is directed at the procedural rights, the process of collective bargaining. And substantive firms, you know, I think the Donovan case is illustrative as to how that operates, because it found that a State law, you know, a substantive employment law, offends 13c-2 only where it places the entire subject of bargaining within management's exclusive control. Contrary to what my friend from the union just argued, it didn't hold that a law that places parameters on outcomes offends Section 13c. I don't understand. I guess I'm just looking at 13b-2a, which is not what's at issue here, but it preserves the continuation of rights under existing collective bargaining agreements. That's the part I was referring to. Yes. That aspect of Section 13c-2 or, I'm sorry, that aspect of Section 13c is aimed at the protection of substantive employment rights. That's what I was trying to get at. Yes. And the Department is not seeking relief under that provision. Both they and the union are only seeking relief under Section 13c-2. All right. I'm sorry. My question was kind of vague, but I wanted to just be sure that we were all talking about the same subparagraph. I appreciate that, and thank you for the clarification. So, you know, knowing what we know about 13c-2's text and what we can glean from it, you know, we now look to PEPRA's text and what it requires and what it leaves open as far as bargaining with PEPRA as a backdrop. Bargaining continues over base wages, which are an important factor in calculating the level of benefits that a retiree will receive. It leaves open bargaining over the contribution rate, so long as employees contribute at least half of the actual cost. And I'll make a quick digression there because there was some discussion during Mr. Winnick's presentation that PEPRA imposes only floors on pension rates and not ceilings. And this is an example of how PEPRA actually establishes both floors and ceilings. The contribution rate requirement under PEPRA is that an employee must — a miscellaneous employee, which is the category at issue here, must contribute up to 50 percent — or must contribute at least 50 percent of the actual cost, but subject to an 8 percent limit, 8 percent being the measure of their base wages. And so PEPRA works both ways, both as a floor and a ceiling. I'd like to just touch on the record evidence that California submitted, which was critically left out of the department's presentation. PEPRA was enacted 12 years ago, so we have at this point 12 years of bargaining experience to look to as evidence of PEPRA's supposed impact on collective bargaining rights. The department's view is that it's not necessary to address this, but California did canvas collective bargaining agreements to determine what had happened in the years since PEPRA was enacted. And what we found was a robust bargaining continues both within and around PEPRA's restraints. There are a number of examples in the record of wage increases that were negotiated specifically to offset increased pension contribution rates. There are also structural changes to pension plans, so we're not just trying to get a dollar-for-dollar offset of PEPRA's added costs. The San Joaquin Regional Transit District proposed closing an underfunded plan, and ATU proposed some concessions that would allow them to keep that plan in place, including narrowing the definition of pensionable compensation and excluding overtime, among other things. And what this shows is that both floors and ceilings are relevant to bargaining, and it's possible to bargain under a ceiling just as easily as it is to bargain over a floor. There are one other thing I'd like to touch on as far as the substantive invalidity. The department argues in its reply brief that PEPRA was enacted as an exercise of California's authority as an employer, and it points to PEPRA's scope, applying only to public workers. This argument is unsupported. So PEPRA was enacted within the scope of California's authority as a regulator, as a broad, generally applicable reform. It applies to union and nonunion workers. It applies to state and local government. And DOL questioned PEPRA's validity as a broad regulation by posing why it didn't also apply to private sector workers. But that is an impossibility under ERISA, which would have preempted any state law attempting to regulate private pensions. The state's authority is limited to public pensions, and so it's not correct to look to PEPRA as a reform that was enacted in California's exercise of its authority as an employer. Malone is more apropos in discussing the, in his discussion of the authority to regulate public pensions as being within state authority. And I think that addresses, Judge Graber, your earlier questions about whether it matters that PEPRA treats public employees differently. It does so for a very specific reason. I would just add, unless the Court has further questions, that in addition to the incredible stakes that are present for California transit agencies, as noted in our brief, California is one of 40 states to have reduced its pension benefits for public employees since 2009, and so the Court's holding in this case may potentially have impacts for those states as well if the Court were to affirm the Department and the union's reasoning. If the Court has no further questions, that concludes my presentation. I'll give counsel each one minute for rebuttal. Thank you, Your Honor. Two quick points. First, on the substance, the distinction California draws between substance and process just isn't meaningful. Everybody agrees this law would violate Section 13C if it said you are forbidden from bargaining over pensions. The fact that what it instead says is you can bargain but you can't agree on these outcomes is an immaterial difference. We're certainly not saying substantive outcomes are guaranteed. We agree with California that's not what the law means. Our point is that as a matter of federal labor policy, California cannot stop employees from bargaining for the outcomes that they want in this regard. And the fact that people have bargained around PEPRA isn't enough. Under that theory, California could forbid all pensions and then say, well, it's enough that you can bargain for higher wages. That just isn't how federal labor policy works. And then just briefly on the advisory opinion question, we agree with both Ms. Ferrari and Mr. Roth that certification requests come up regularly. That's clear in the record from the Auerbach Declaration. And for that reason, we agree that this is right both constitutionally and prudentially. It's constitutionally right because we agree California had concrete and imminent injuries at stake if the letter were to go forward. And we agree it's prudentially right because the issues are, I think, crystallized for the Court's consideration, which is not true with many non-binding statements of policy and because there would be a hardship to all parties from having to litigate it in the context of individual denials for, I think, the reasons Ms. Ferrari explained. Thank you, Your Honors. One minute. I think my one minute just because I think it's critical because it cuts to both the substantive and the finality rightness procedural arguments that the Court has raised. There's this argument that the Department and ATU's interpretation is flawed because it ignores evidence about the bargaining that's actually taken place under PEPRA. That's not relevant evidence under the statute because the district court, where the district court got this wrong most fundamentally is to say that 13C doesn't enshrine a right to bargain over all, you know, individual rights, individual terms. So the focus has to be on individual terms of bargaining. And the fact that it cuts way back on one right, one bargaining right, is not saved by the fact that it preserves other bargaining rights. That's the whole point. And that's why it's irrelevant for rightness purposes and finality purposes as well. Okay. Thank you, Counsel, for your helpful arguments. This matter is submitted.
judges: TASHIMA, GRABER, SUNG